UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 22 CR 618 |
| v. | |
| MUSTAFAA SALEH | Hon. Andrea R. Wood |

## GOVERNMENT'S SENTENCING MEMORANDUM[1]

The United States of America, by and through its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby respectfully submits the Government's Sentencing Memorandum, and asks this Court to sentence the defendant, Mustafaa Saleh, to 33 months' imprisonment, followed by a two-year term of supervised release and a personal money judgment in the amount of $172,706.81.

### I. Advisory Guidelines Range

The government agrees with the criminal history and offense level calculations set forth in the Presentence Investigation Report (PSR). Defendant's total offense level is 20 and his criminal history category is I, resulting in an advisory Guidelines range of 33 to 41 months' imprisonment.

---

[1] The government is filing this memorandum late; it was due on June 1, 2023. The government respectfully moves the Court for permission to file *instanter*. Lead counsel is preparing for trial in *United States v. Weiss*, 19-CR-805-2, which is scheduled to begin on June 5, 2023 before Judge Steven C. Seeger. Undersigned counsel has communicated with defense counsel, who does not object to this request.

## II. The Government's Position on Sentencing

The district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the guidelines range. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). The sentence imposed must be "sufficient, but not greater than necessary," to comply with the purposes of sentencing provided under 18 U.S.C. § 3553(a)(2).

### A. Application of the Section 3553(a) Sentencing Factors

For the reasons set forth below, the United States respectfully requests that the Court sentence defendant to a total term of imprisonment of 33 months, which is at the low end of the advisory Guidelines range of 33 to 41 months' imprisonment. This sentence is sufficient but not greater than necessary to satisfy the principles set forth in 18 U.S.C. § 3553(a).

### i. Nature and Circumstances of the Offense and the History and Characteristics of Defendant Support a Guidelines Sentence of 33 Months' Imprisonment

Defendant engaged in serious criminal conduct that amply justifies a serious sentence. Over a period of more than 5 years, defendant manipulated and abused his position of public trust in an important government organization, the Cook County Land Bank Authority (CCLBA), for his own financial benefit. Defendant directly interfered with the CCLBA's mission and deprived honest individuals of the benefits and opportunities that the CCLBA was specifically designed to provide. Moreover, defendant's adverse impact on the CCLBA and individuals in this community was

not a mere collateral consequence of defendant's scheme; but instead, was necessary to defendant's scheme and intended by defendant. As explained further below, defendant designed and implemented a complex multi-part scheme in which defendant recruited numerous individuals to participate, created corporate entities and email accounts, and falsified financial records to deceive the CCLBA and a lending institution.

Defendant's role in the offense reflects an extensive level of greed. Defendant exploited multiple opportunities to wring as much financial profit as possible from his role as an Asset Manager with the CCLBA. With respect to the first facet of his scheme, defendant assembled a cadre of straw buyers to fraudulently purchase properties from the CCLBA, falsely representing that they were actual buyers of CCLBA properties, when in reality defendant took control and ownership of the properties. Defendant was aware that the CCLBA and the Cook County Ethics Ordinance specifically prohibited this conduct, and so employed enhanced levels of deception, including sending and receiving emails from a third-party email account so he could pose as the straw buyers in communications with the CCLBA, and by forming a shell company that he used solely for the purpose of covertly purchasing properties from the CCLBA. In addition, defendant took advantage of his inside role at the CCLBA in multiple ways. For example, defendant certified that certain properties he fraudulently obtained from the CCLBA were adequately renovated and improved so the CCLBA would lift its deed restrictions, which was a measure of protection the CCLBA utilized to insure both quality renovation work was being

3

completed and adherence to their policies. Unbeknownst to the CCLBA, defendant was certifying repair work that he was performing. By acting in this manner, defendant circumvented this check and balance and deprived the CCLBA of one of its most effective monitoring tools.

Defendant's straw purchasing scheme was pervasive, multi-layered, and designed so that he could avoid detection and financially profit. By way of example, defendant's fraudulent efforts relating to Property 6 show defendant's extensive efforts to financially benefit from his CCLBA position. Defendant not only acquired Property 6 using a straw purchaser, but also evaded the CCLBA's deed restrictions by renting it out to private individuals without the knowledge or permission of the CCLBA. Defendant then fraudulently used Property 6 as collateral for a $352,000 loan in violation of the CCLBA's deed restriction. In order to do so, defendant (a) concealed from the CCLBA his use of Property 6 as collateral for the mortgage loan; (b) intentionally did not notify the lending institution of the CCLBA's deed restriction and interest in Property 6; and (c) made false statements to the lending institution concerning his assets, including creating and submitting to the lending institution a false bank account statement that fraudulently inflated defendant's account balance.[2] In other words, defendant used a CCLBA property to further a separate and distinct crime: mortgage fraud.

---

[2] *Compare* Exhibit A, which is an excerpt of defendant's submission to the Loan Officer, containing, among other attachments, defendant's false bank statement and affirmations as to his bank assets, *with* Exhibit B, which shows defendant's actual bank statement. Exhibit C contains a summary of an interview with the Loan Officer for defendant's loan, describing the materiality of true asset information for a borrower when funding any loan.

Defendant – not simply content with the financial windfall from his scheme involving his straw purchase buys – enacted a second fraudulent scheme whereby he created a property maintenance company in the name of a nominee owner and used it to contract with and bill the CCLBA. All the while, defendant hid that he secretly controlled that business from the CCLBA, knowing this was also in violation of the ethics provisions.

Defendant's role as the mastermind of the operation cannot be understated. Not only did he concoct various avenues to commit fraud through his position of employment at the CCLBA, but he enlisted multiple individuals for each part of his scheme. Defendant's role was not merely participatory; he actively recruited others to play major roles in his scheme including, among others, 4 separate straw buyers and Individual E, who he directed to pose as the owner of a property maintenance company that defendant controlled.

Defendant's conduct as the leader of this scheme was both significant and long-lasting. Over the course of 5 years, defendant took repeated, sustained actions to financially benefit himself. Defendant's crimes were no one-time mistake or lapse of judgment – the fraud was intricately planned, continuously executed over the course of years, and involved several layers of concealment. In addition, during the entire period he was involved in the fraud scheme, defendant was simultaneously lying about his commitment to the mission of the organization and his compliance with it's ethical standards. And, when confronted with his actions during an interview with

5

federal law enforcement, defendant falsely claimed that he had never collected the proceeds from the sale of any CCLBA property—a deliberate lie.

Defendant enacted his fraud scheme to the detriment of an important government organization and the honest individuals whom it was intended to benefit. As a direct result of defendant's actions, the CCLBA has suffered a loss of public trust and confidence. In sentencing defendant, the Court should give great weight to the impact of defendant's scheme on the CCLBA, which through its Deputy Director Darlene Dugo, has provided a victim impact statement. *See* Exhibit D. As Dugo explained, the defendant's criminal misconduct was "incredibly damaging to the CCLBA's professional reputation within the community as a major Cook County entity working to serve our residents as well as the employees who work here." Dugo was defendant's colleague and worked alongside him over a period of several years, where she strove to fulfill the laudable mission of the CCLBA to improve communities, increase affordable housing, promote economic development, and create sustainable communities. However, Dugo explained that the fact the defendant – an employee of the CCLBA – was under federal investigation for criminal misconduct while at the CCLBA led to a loss of public trust and confidence in the CCLBA and its mission. Dugo described that the public consumption of media coverage about defendant's actions meant citizens could only assume that CCLBA personnel use insider information to benefit themselves and gain an advantage over the normal citizen who may have been trying to purchase a property from the CCLBA. As an added level of frustration, Dugo explained that the perception was exactly what

6

CCLBA has always attempted to guard against with their internal and county-wide ethics training.

Defendant was undoubtedly aware of the CCLBA's focus on ethics and its mission. Dugo explained that she had worked with defendant for years and had numerous conversations with him about the CCLBA's potential for a positive impact in Cook County with regard to the large inventory of abandoned and/or neglected properties. She further reiterated that she had many discussions about the fact that employees at the CCLBA must hold themselves to high ethical standards and ensure they do not do anything that would be a conflict of interest or internal self-dealing. In order to accomplish his scheme, defendant had no qualms about deceiving not an inanimate entity, the CCLBA, but the very individuals with whom he worked on a daily basis; individuals who trusted that defendant's conduct was motivated by a shared goal to improve the community, and not, as it was, by personal financial benefit and greed.

Defendant's role is further aggravated because he targeted a program that was focused on improving those communities in Cook County that need it the most, where many factors already work against the businesses and people who reside there. The properties that defendant bought from the CCLBA might have instead gone to an individual in financial need seeking to become a homeowner, who could not otherwise afford a home absent the substantial discounts offered by the CCLBA. That home, in turn, could have served to enrich an honest homeowner by providing long-term financial security. Defendant's scheme not only circumvented the CCLBA's goal, but

also ensured that any financial benefits would not pour into the communities and people he pledged to serve.

Defendant, instead of pursuing the admirable CCLBA mission – which is both critically needed and difficult to implement – chose to prey on this program for his own financial enrichment. Dugo describes being "absolutely shocked" and "very personally and professionally disappointed" when informed of the allegations, particularly given the defendant had a desk feet away from hers and they spoke every day. Dugo further explained that that she felt deceived by his false representations and became "very emotional when I realized that he had not been forthright or honest with me for years regarding his personal involvement in purchasing certain CCLBA properties." In addition to Dugo's own personal reflection on the impact of defendant's crimes, she detailed the extensive work that the CCLBA has done in response to defendant's criminal misconduct, including at least 200 hours of time on matters related to this case, that took the place of the CCLBA's daily work pursuing its mission.

### ii. A Guidelines Sentence of 33 Months' Imprisonment is Necessary to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

In addition to the criteria above, a Guidelines sentence is necessary to deter specifically defendant, and generally other government employees in the Northern District of Illinois from abusing their positions of trust, exploiting their positions, and compromising the integrity of the government entities they work for. The CCLBA, and other government entities like it, only function and serve the public when

8

members of the community have confidence that they will perform the services they are entrusted with. And defendant's conduct here is particularly egregious given that he exploited that public trust using multiple methods, including by using his own government position to enrich himself for over 5 years.

Both general and specific deterrence are compelling factors in this case. With respect to general deterrence, the CCLBA is a government organization that prohibits employees from having a financial interest in CCLBA properties for investment purposes, and from having a financial interest in property maintenance companies contracting with the CCLBA. Defendant violated both of those provisions through his self-dealing, and his fraud constituted an egregious misuse of public trust. This makes it especially critical that would-be offenders are deterred in advance, particularly offenders who would endeavor to take a position within the organization and exploit it. This will only happen if those who are caught receive meaningful punishment. Defendant's actions depleted the public's trust that those involved in the CCLBA operate in a fair playing field, and the public has a strong interest in punishing this conduct. The result would otherwise make it more challenging to those who abide by the law.

With respect to specific deterrence, defendant's actions in the scheme reflect an expansive and thorough series of steps to perpetuate the scheme. Defendant will most likely re-enter the workforce after completing his sentence, and specific deterrence is an appropriate consideration, given defendant's relatively young age,

interest in re-entering the real estate field, and his concerted efforts in this crime to both enact and expand his long-running scheme.

In the government's view, a 9-month sentence of imprisonment would be inadequate in light of the § 3553(a)(2) factors highlighted above. The Probation Office appears to rely primarily on defendant's lack of criminal history, role in his family – both as a father and as the sole financial support –, and his compliance with his conditions of release in recommending a sentence of 9 months' imprisonment.

A below-guideline sentence is particularly inappropriate in this case given that the guidelines do not account for other serious criminal conduct that defendant committed in relation to the scheme of conviction, namely, mortgage fraud and lying to federal agents. Further, both the government and the Probation Office have taken a conservative approach to defendant's guidelines calculation by seeking the 2-level aggravating role adjustment under Guideline § 3C1.1(c), as opposed to the 4-level aggravating role adjustment under Guideline § 3C1.1(a), for which defendant at least arguably qualifies. Thus, if anything, the guidelines understate the seriousness of the offense, and the Court should not go any lower.

With respect to defendant's lack of criminal history, that is already factored into the guidelines calculation. Moreover, although defendant does not have an extensive criminal history, defendant's criminal conduct in this case was not a brief, one-time crime or lapse in judgment, but an ongoing course of conduct. Defendant showed up to work, day after day, for five years, and made the conscious choice to commit a crime. That is an aggravating, not mitigating, factor.

With respect to defendant's role in the family and employment status, defendant reported a close relationship with his family, including his wife, children, parents, and siblings. This is mitigating in that defendant plays an important role in supporting his family and has a stable environment with a caring family to return to following his punishment in this offense. However, it is also aggravating in that defendant engaged in the instant offense and took advantage of his position of public trust despite having the familial and environmental support that so many defendants who come before this Court do not have. In addition, the defendant is not unlike many other wire fraud defendants who come before this court, with family and financial responsibilities that would be negatively impacted by his choices.

Finally, defendant's compliance with conditions of release does not lend support to a downward variance from the Guidelines. Defendant has been on pretrial release for slightly over 6 months and his pretrial release compliance is both necessary and expected by this Court. Defendant's law-abiding behavior while knowing that he is under watchful eyes is not a positive factor, but simply not a negative one and certainly does not warrant a downward departure at sentencing.

In the final analysis, the government does not agree that defendant's history and characteristics support a below guidelines sentence of 9 months. A sentence of 33 months' imprisonment is necessary given the nature and circumstances of the offense and the history and characteristics of the defendant, as well as to afford adequate deterrence, provide just punishment, and promote respect for the law.

### B. Supervised Release

The count of conviction carries a discretionary term of supervised release of up to 3 years. The government recommends the Court impose a two-year term of supervised release that includes all the conditions the Probation Office set out in the PSR, with the exception of discretionary condition 7—there does not appear to be a sufficient basis in the record to restrict defendant's alcohol use. All other conditions are appropriate to facilitate effective supervision, prevent defendant from reoffending, and ensure defendant meets his obligations.

### C. Mandatory Restitution

Pursuant to 18 U.S.C. § 3663, restitution is not mandatory in this case.

### D. Forfeiture

Pursuant to paragraph 15 of the plea agreement, defendant has agreed to a personal money judgment in the amount of $172,706.81. The defendant agrees that the amount of the forfeiture money judgment represents property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of defendant's violation of Title 18, United States Code, Section 1343. The government will file a preliminary order of forfeiture prior to the sentencing hearing and asks that the Court enter the order.

## E. Conclusion

For the reasons set forth above, the government respectfully asks this Court to impose a sentence of 33 months' imprisonment, followed by a two-year term of supervised release and a personal money judgment in the amount of $172,706.81.

Respectfully Submitted,

MORRIS PASQUAL
Acting United States Attorney

By:     */s/ Kirsten Moran*
        Kirsten Moran
        Sean J.B. Franzblau
        Brian Netols
        Assistant United States Attorneys